1  Jason R. Flanders (Bar No. 238007)
2  Email: jrf@atalawgroup.com
   Theresa M. Trillo (Bar No. 349989)
3  Email: tt@atalawgroup.com
4  AQUA TERRA AERIS LAW GROUP
   4030 Martin Luther King Jr. Way
5  Oakland, CA 94609
6  Telephone: (916) 202-3018

7  Barak J. Kamelgard (Bar No. 298822)
8  Email: Barak@lawaterkeeper.org
   Benjamin A. Harris (Bar No. 313193)
9  Email: ben@lawaterkeeper.org
10 LOS ANGELES WATERKEEPER
   360 E 2nd Street Suite 250
11 Los Angeles, CA 90012
12 Telephone: (310) 394-6162

13 *Attorneys for Plaintiff*
14 LOS ANGELES WATERKEEPER

15          **UNITED STATES DISTRICT COURT**
16          **CENTRAL DISTRICT OF CALIFORNIA**

17 LOS ANGELES WATERKEEPER, a        | Case No.
   California non-profit association,
18                                   | **COMPLAINT FOR**
                  Plaintiff,         | **DECLARATORY AND**
19                                   | **INJUNCTIVE RELIEF AND**
        v.                           | **CIVIL PENALTIES**
20
   Bodycote Thermal Processing, Inc., a
21 Delaware corporation,             | **(Federal Water Pollution**
                                     | **Control Act, 33 U.S.C. §§ 1251 *et***
22                Defendant.         | ***seq*.)**
23
24
25
26
27
28

**Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff"), by and through its counsel, hereby allege the following upon information and belief:**

## I.  JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     Pursuant to 40 C.F.R. § 135.2(a)(2), on July 18, 2023, LA Waterkeeper issued a 60-day notice letter (the "Notice Letter"), to the registered agent for service of process for Bodycote Thermal Processing, Inc. ("Bodycote" or "Defendant"), as it is the owner and operator of the industrial facility located at 3370 Benedict Way, Huntington Park, California 90255 with Waste Discharger Identification Number 4 19I018443 (the "Facility").[1] Plaintiff also issued the Notice Letter to Bodycote's Chief Executive Officer as well as its General Manager.

3.     The Notice Letter was also sent to the U.S Attorney General Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

4.     The Notice Letter informed Defendant of its ongoing violations of substantive and procedural requirements of the CWA, 33 U.S.C. § 1251 et seq. and California's General Industrial Storm Water Permit, National Pollution Discharge

---

[1] The Facility is fully described in Section V below.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Elimination System ("NPDES") General Permit No. CAS000001 Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) Total Maximum Daily Load ("TMDL") Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use, and as subsequently amended by Order No. 2018-0028-DWQ incorporating TMDL effluent limits (effective July 1, 2020) (hereafter the "Storm Water Permit" or "General Permit") and the Clean Water Act at the industrial facility located at the Facility.

5.     The Notice Letter informed Defendant of Plaintiff's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

6.     More than sixty (60) days have passed since both the Notice Letter was served on the Defendant and the State and Federal agencies. Plaintiff is informed and believes, and in turn alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B).

7.     This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

9.     Plaintiff seeks relief for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.   <u>INTRODUCTION</u>

10.     With every significant rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility referenced herein, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

11.    High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons, are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces. Storm water discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic, and the solubility of a substance varies as a function of the pH of a solution. A one-whole-unit change in SU represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

within it will become stressed or die.

12.    This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Facility.

13.    Plaintiff specifically alleges violations regarding Defendant's discharge of pollutants from the Facility into waters of the United States; violations of the monitoring, reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.  **PARTIES**

### A. Los Angeles Waterkeeper

14.    LA Waterkeeper is a non-profit 501(c)(3) public benefit corporation organized under the laws of the State of California. LA Waterkeeper maintains an office at 360 E. 2nd Street, Suite 250, Los Angeles, California 90012.

15.    LA Waterkeeper's members live and/or recreate in and around Los Angeles. LA Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and others.

16.    LA Waterkeeper members work, own homes and live in Los Angeles County and use and enjoy the waters near the Facility, including Los Angeles River, and just downstream, the Los Angeles River Estuary, Queensway Bay, San Pedro Bay, and the Pacific Ocean (the "Receiving Waters"). LA Waterkeeper members also use and enjoy the bordering parks, pathways, golf courses, athletic fields, and beaches, including but not limited to Junipero Beach. They also enjoy and use other connected waterways to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, run,

fish, surf, swim, sail, and recreate. LA Waterkeeper members engage in scientific study through pollution and habitat monitoring and restoration activities in and along all these waters.

17.    Discharges of polluted storm water and non-storm water from the Facility degrade water quality and harm aquatic life in the Los Angeles River, the Los Angeles River Estuary, Queensway Bay, San Pedro Bay, and the Pacific Ocean, and impair LA Waterkeeper's members use and enjoyment of those waters. The unlawful discharge of pollutants from the Facility requires LA Waterkeeper to expend its limited resources to study and combat pollution from the Facility.

18.    The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous, including but not limited to Defendant's discharge of polluted storm water from the Facility. Thus, the interests Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Storm Water Permit and the Clean Water Act.

19.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

20.    The interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Storm Water Permit. The relief sought herein will redress the harm to Plaintiff caused by Defendant's activities.

**B. The Owners and/or Operators of the Facility**

21.    Plaintiff is informed and believes, and thereon alleges, that Bodycote maintains its headquarters at 12750 Merit Dr., Suite 1400 Dallas, Texas 75251. Bodycote operates the Facility and conducts business at 3370 Benedict Way, Huntington Park, California, 90255.

22.    Plaintiff is informed and believes, and thereon alleges, that Bodycote is an owner and operator of the Facility.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

23.     Plaintiff is informed and believes, and thereon alleges, that Bodycote was formed in Delaware and registered in California.

24.     Plaintiff is informed and believes, and thereon alleges, that Bodycote has a Registered Agent through the CT Corporation System. The address listed on the California Secretary of State website for the CT Corporation System is 330 N. Brand Blvd., Glendale, California 91203.[2]

25.     LA Waterkeeper refers to Defendant Bodycote and its management herein as the "Owners/Operators" of the Facility.

## IV.     STATUTORY BACKGROUND

### A. The Clean Water Act

26.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

27.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

28.     Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology

---

[2] The CT Corporation System website (Wolters Kluwer) includes a list of service of process locations, indicating the following address for California: 330 North Brand Blvd., Suite 700 Glendale, California 91203. *See* Wolters Kluwer, CT Corporation Service of Process Locations, https://www.wolterskluwer.com/en/solutions/ct-corporation/sop-locations?compositeLink=%7B4644242D-DFCB-4E96-B50C-966935277C28%7D.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

29.     The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. §§ 1311(a) and 1342; *see* 40 C.F.R. § 122.26(c)(1).

30.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

31.     The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

32.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

33.     "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7); 33 CFR § 328.3.

34.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

35.     The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

36.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

37.     Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA occurring after November 2, 2015, commencing five years prior to the date of Notice of Violation and Intent to File Suit subjects each Defendant to a penalty of up to $64,618 per day per violation.

38.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

**B. California's Storm Water Permit**

39.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See* 33 U.S.C. § 1342(b).

40.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, (2006) 135 Cal. App. 4th 1377, 1380-81. In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001. The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. Storm Water Permit, Section XXI(A).

41.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. 33 U.S.C. § 1313(a). The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

42.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

43.     On July 1, 2015, the current Storm Water Permit became effective and was issued as *NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ*. Storm Water Permit, Section I(A) (Finding 4).

44.     On November 6, 2018, the State Board amended the Storm Water Permit with Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use ("2018 Permit Amendment").

45.     On July 1, 2020, the State Board subsequently amended the Storm Water Permit with Order No. 2018-0028-DWQ, incorporating TMDL effluent limits ("2020 Permit Amendment").

46.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I.A (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm

Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I.A (Finding 17), Section II.B.

**C. The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

47.    The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

48.    Effluent Limitations Section V(A) of the Storm Water Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, TSS, oil and grease ("O&G"), pH, and fecal coliform.

49.    Discharge Prohibition III(C) of the Storm Water Permit prohibits storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

50.    Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b). Storm Water Permit, Section V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed.

Reg. 64,746, 64,766-67 (Oct. 30, 2000).

51.     The 2015 Multi-Sector Permit parameter Benchmarks, among others, are as follows: TSS—100 mg/L; aluminum—0.75 mg/L; nitrate plus nitrite as nitrogen ("N+N")—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082 mg/L; cadmium—0.0021 mg/L; cyanide—0.022 mg/L; copper—0.014 mg/L; zinc—0.12 mg/L; iron—1.0 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; chemical oxygen demand— 120 mg/L; arsenic—0.15 mg/L; magnesium—0.064 mg/L; nickel—0.47 mg/L; selenium—0.005 mg/L; and silver—0.0032 mg/L.[3]

52.     The EPA's most recent, 2021 Multi-Sector Permit parameter Benchmarks for the following parameters, among others, are as follows: TSS—100 mg/L; aluminum—1.1 mg/L; N+N—0.68 mg/L; ammonia—2.14 mg/L; lead—0.082 mg/L; cadmium—0.0018 mg/L; cyanide—0.022 mg/L; copper—0.00519 mg/L; zinc—0.12 mg/L; pH—6.0-9.0 s.u; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; nickel—0.47 mg/L; selenium—0.0031 mg/L; and silver—0.0032 mg/L.

53.     The Storm Water Permit contains Numeric Action Levels ("NALs") that generally mirror the 2008 EPA Benchmark Values. *See* Storm Water Permit, Section I(M)(Finding 62). Annual NALs, not accounting for water hardness, for the following parameters are: TSS—100 mg/L; copper—0.0332 mg/L; zinc—0.26 mg/L; nickel— 1.02 mg/L; lead—0.262 mg/L; cyanide—0.022 mg/L; iron—1.0 mg/L; cadmium— 0.0053 mg/L;      N+N—0.68 mg/L; ammonia—2.14 mg/L; O&G—15 mg/L; aluminum—0.75 mg/L; biological oxygen demand—30 mg/L; chemical oxygen demand—120 mg/L; arsenic—0.15 mg/L; magnesium—0.064 mg/L; nickel—1.02 mg/L; selenium—0.005 mg/L; and silver—0.0183 mg/L. Storm Water Permit, Table 2

---

[3] The 2015 and 2021 Multi-Sector Permit parameter Benchmarks for cadmium, nickel, silver, and zinc are dependent on water hardness where discharged into freshwater. The benchmark value listed herein is based on a hardness of 100 mg/L.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

at 47. Instantaneous Maximum NALs, for the following parameters are: pH—6.0 – 9.0 s.u.; TSS—400mg/L; O&G—25mg/L. *Id.*

54.     An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

55.     An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. Stormwater Permit Section XII.A.

56.     Receiving Water Limitation Section VI(B) of the Storm Water Permit prohibits storm water discharges from adversely impacting human health or the environment.

57.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation. Storm Water Permit, Section VI(B).

58.     Receiving Water Limitation Section VI(A) of the Storm Water Permit prohibit storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

59.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

60.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

61.     The State Water Quality Control Board, Los Angeles Region, has issued the Water Quality Control Plan for the Los Angeles Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

discharges, prohibitions, and to further statewide plans and policies. The Basin Plan sets forth water quality objectives for dissolved metals such as aluminum, arsenic, and mercury. Basin Plan, Table 3-8. The Basin Plan states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id*. at 3-44. The Basin Plan also provides that "Toxic pollutants shall not be present at levels that will bioaccumulate in aquatic life to levels which are harmful to aquatic life or human health." *Id*. at 3-29.

62.     The Basin Plan's WQS also require a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as the Los Angeles River and its watershed.

63.     The Basin Plan specifies potential, intermittent, and existing beneficial uses for the Los Angeles River Reach 2 including municipal and domestic supply, industrial and service supply, groundwater recharge, warm freshwater habitat, and wildlife habitat. Basin Plan, Table 2-1. The Basin Plan further specifies beneficial uses for Reach 1 of the Los Angeles River and the Los Angeles estuary which include the above, and include but are not limited to other beneficial uses: marine habitat, estuarine habitat, wetland habitat, spawning, reproduction, and/or early development, migration of aquatic organisms, and rare, threatened, or endangered species. Basin Plan, Table 2-1.

64.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. §1313(d).

65.     Reach 2 of the Los Angeles River is impaired for Trash, Nutrients (Algae), Ammonia, Indicator Bacteria, Oil, Copper, and Lead. It has been proposed in the Draft California 2024 Integrated Report that Reach 2 will also be listed for Oil and Grease and Zinc. Further downstream, Reach 1 of the Los Angeles River is impaired for Copper (Dissolved), Cadmium, Ammonia, Zinc (Dissolved), pH, Cyanide, Nutrients (Algae), Indicator Bacteria, Trash, and Lead. It has been proposed in the Draft California 2024 Integrated Report that Reach 1 will also be listed for Aluminum;

1 Bifenthrin; Cyfluthrin; Cypermethrin; Deltamethrin; Fipronil; Imidacloprid; Iron; Oil
2 and Grease; Permethrin; Profenofos; Pyrethroids; Temperature; and Toxicity. It has
3 also been proposed that cadmium be delisted. The Los Angeles River Estuary and
4 Queensway Bay are also listed for impairments including Chlordane (sediment), DDT
5 (sediment), PCBs (Polychlorinated biphenyls) (sediment), Toxicity, and Trash. It has
6 been proposed in the Draft California 2024 Integrated Report these waters will also be
7 listed for Copper, Indicator Bacteria, Dissolved Oxygen, Temperature, and Zinc. San
8 Pedro Bay is listed for impairments including Chlordane, PCBs (Polychlorinated
9 biphenyls), Toxicity, and Total DDT (sum of 4,4'- and 2,4'- isomers of DDT, DDE,
10 and DDD). It has been proposed in the Draft California 2024 Integrated Report that
11 San Pedro Bay will also be listed for Copper; DDE
12 (Dichlorodiphenyldichloroethylene); DDT (Dichlorodiphenyltrichloroethane); and
13 Temperature. The Receiving Waters are impaired, and Defendant's discharges of
14 pollutants above the WQS contributes to the continued impairment of the receiving
15 waters' beneficial uses.

16    66.    In addition, EPA has promulgated WQS for toxic priority pollutants in all
17 California water bodies ("California Toxics Rule" or "CTR"), which apply to the
18 Receiving Waters, unless expressly superseded by the Basin Plan. 40 C.F.R. § 131.38.
19 The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can
20 be as low as, 0.065 mg/L for lead, 0.013 mg/L for copper, 0.12 mg/L for zinc, 0.022
21 mg/L for cyanide, 0.0043 mg/L for cadmium, 0.34 mg/L for arsenic, 0.47 mg/L for
22 nickel, and 0.0034 mg/L for silver, in freshwater surface waters with water hardness
23 calculation of 50 mg/L.[4]

24    67.    The CTR includes further numeric criteria set to protect human health and
25 the environment in the State of California. *See* Establishment of Numeric Criteria for

---

[4] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit requires permittees to report their sample results as total metal concentrations. (*See* Storm Water Permit, Attachment H at ¶ 18.)

Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: https://www.epa.gov/wqs-tech/water-quality-standards-establishment-numeric-criteria-priority-toxic-pollutants-state.

68.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of the Storm Water Permit's Receiving Water Limitations. *See* Storm Water Permit, Section VI(A).

**D. The Storm Water Permit's Numeric Effluent Limitations**

69.    Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E. TMDLs in place for pollutants discharged from industrial facilities to the Los Angeles River and its tributaries include nitrogen and metals. Storm Water Permit, Attachment E, Table E-1.

70.    Discharges from the Facility are subject to the Los Angeles River tributaries and watershed TMDL requirements, which include the following NELs: Nitrate-Nitrogen (8.0 mg/L), Nitrite-Nitrogen (1.0 mg/L), Nitrate+Nitrite Nitrogen (8.0 mg/L), Ammonia (8.7 mg/L), copper (0.06749 mg/L), lead (0.094 mg/L), cadmium (0.0031 mg/L), and zinc (0.159 mg/L). Storm Water Permit, Attachment E, Table E-2.

71.    An exceedance of an NEL constitutes a violation of the General Permit. (General Permit, Attachment C at 5.) An NEL exceedance occurs when two (2) of more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NEL value listed in Table E-2 of Attachment E to the General Permit. *Id.*

**E. The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

72.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54) and X(B). The SWPPP must identify and evaluate sources

of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Sections I(D) (Finding 32) and X(C).

73.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

74.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

75.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

76.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55) and X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined to not be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).

**F. The Storm Water Permit's Monitoring Implementation Program Requirements**

77.     The Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan ("MIP"). Storm Water Permit Sections X(I) and XI(A)–(D). The MIP must ensure that storm water discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The MIP must ensure that practices at the facility to prevent or reduce pollutants in storm water and

authorized non-storm water discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

78.    Further objectives of the MIP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

79.    The MIP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id.*

80.    The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55–56) and XI.

81.    Section XI(A)(4) of the Storm Water Permit requires that the MIP shall be revised as necessary to ensure compliance with the Storm Water Permit.

82.    Section XI(A) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges.

83.    Section XI(A)(2) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

84.    The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

discharged. Storm Water Permit, Section XI(B)(4).

85.     Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

86.     Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

87.     Section XI(B)(6) of the Storm Water Permit requires dischargers to analyze storm water samples for TSS, O&G, pH, and additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

88.     All facilities are required to sample storm water for TSS, O&G, and pH. Facilities must also sample and analyze for additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment, as required by the Storm Water Permit and the Regional Board, and additional parameters related to receiving waters with 303(d) listed impairments. Storm Water Permit, Section XI(B)(6). When self-reporting storm water sample results, Defendant sampled for Zinc ("Zn"), Iron ("Fe"), Aluminum ("Al"), Nitrate + Nitrite Nitrogen ("N+N"), Lead ("Pb"), Copper ("Cu"), Cyanide ("Cn"), Ammonia ("NH"), Total Suspended Solids ("TSS"), Oil and Grease ("O&G"), and pH.

89.     Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the permit, an

explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

**G. Exceedance Response Action Requirements**

90.    When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status." *See* 2015 Permit, Section XII(B). A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *See* Storm Water Permit, Section XII(C).

91.    Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* Storm Water Permit Section XII(C)(1)(a)-(c).

92.    Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* Storm Water Permit, Section XII(C)(1)(c).

93.    Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* Storm Water Permit,

Section XII(C)(2)(a)(i)-(ii).

94.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* Storm Water Permit, Section XII(C)(2)(a)(iii).

95.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* Storm Water Permit, Section XII(C)(2)(b).

96.    A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the Discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* Storm Water Permit, Section XII(D).

97.    A Discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a Discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See* Storm Water Permit, Section XII(D).

## V.    **STATEMENT OF FACTS**

### A. **Bodycote Facility Site Description, Industrial Activities, and Pollutant Sources at the Facility**

98.    Defendant operates an industrial facility located at 3370 Benedict Way, Huntington Park, California, 90255 in close proximity to the Los Angeles River. The Facility's primary industrial purpose is the annealing, brazing, burning, hardening, heat treating, abrasive blasting, and plating of metal parts. The Facility's NOI classifies the

Facility under Standard Industrial Classification Code ("SIC") 3398, covering metal heat treating.

99.    Further industrial activities at the Facility include cardboard recycling, forklift traffic, storage tanks, shipping and receiving, hazardous waste storage, chemical storage, and equipment maintenance, vehicle traffic, loading, furnace, plating lines, pH scrubber, handling and storage of associated industrial materials (i.e. metals, gas, lubricants, and hazardous materials), wood pallet stockpiling, dust and particulate generating industrial operations, vehicle maintenance, scrap metal storage, and shipping of finished product.

100.   There are areas at the Facility for each of these industrial activities and notably, Trash bins, wood pallets, and empty metal containers are all stored outdoors.

101.   The Facility's NOI indicates that the site is 70,684 square feet with all 70,684 square feet being exposed to stormwater, whereas the Facility's SWPPP indicates that the property is 217,800 square feet. The site is approximately 99% impervious, as indicated by the Facility's SWPPP, while the Facility's NOI does not provide a percentage.  The Facility footprint is bisected by Benedict Way and Bissel Place. There are buildings located on the southern section of the Facility and areas of industrial activity in the northern section. The Facility' last updated SWPPP notes that the Facility operates 24-hours a day, Monday through Saturday.

102.   The following areas are identified in the Facility SWPPP as areas of industrial activities: manufacturing, plating lines, heat treating, cardboard recycling, pH scrubber, shipping and receiving, abrasive blasting, equipment maintenance, outdoor hazardous waste storage, furnace operations, welding, and grinding take place throughout the facility footprint. Other industrial activities involve outdoor bulk tank storage of nitrogen, ammonia, and argon, outdoor metal storage, pallet storage, industrial waste storage, empty container storage, outdoor hazardous material storage, water cooling tower, and vehicle traffic in the form of truck and forklift traffic and commuter vehicle traffic, as well as car parking also occur at the Facility.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

103.   Plaintiff is informed and believes, and thereon alleges, that industrial activities at the Facility, many of them conducted outdoors and exposed to storm water include, but are not limited to, the activities listed above. Aluminum and metal shavings, chips, dust and particulates, and chemical sediment from these activities can accumulate around the Facility. Dirt and residue from roofs at the Facility also contribute to pollutants in storm water. The industrial activities detailed above expose pollutants to storm water via direct contact, building exhaust and ventilation, track out, dust and debris, traffic, and spills and leaks.

104.   The industrial areas and associated activities generate and release pollutants at the Facility which are discharged into storm water.

105.   Pollutants from these activities accumulate at the Facility and contribute to pollutants in storm water. Pollutants of concern at the Facility include but are not limited to ammonia, lead, cyanide, oil & grease, pH, iron, TSS, zinc, aluminum, N+N, copper, and those mentioned in Sections 5 and 6 of the Facility SWPPP. These pollutants are subject to tracking to other areas of the Facility, and offsite of the Facility, by employees, transfer of industrial materials between work areas and warehouses, loading and unloading of industrial materials, vehicle and forklift traffic, and use of heavy industrial equipment.

106.   Bodycote indirectly discharges into the Los Angeles River, as identified as the Receiving Water on Bodycote's Notice of Intent.

107.   The Facility SWPPP describes four (4) drainage areas identified as DA 1, DA 2, and DA 3, and DA 4. DA 1 is located in the northern section of the Facility adjacent to Bissell Place and Randolph Street. Industrial activity in DA 1 includes chemical storage, air tanks, propane storage, and hazardous materials storage. During storm water sampling events, storm water discharged from DA 1 flows north towards Randolph Street and includes certain runoff from the buildings at the Facility, and is sampled at discharge point 1 ("D1"). DA 2 is found in the southeastern corner of the facility, facing Bissel Place and Benedict Way and adjacent to sampling point 1. Storm

water flows southeast by the abrasive blasting area, cooper strip line and copper plating line towards Bissel Place west to discharge point 2 ("D2"). DA 3 is located opposite from D2, on Benedict Way and storm water discharge flows west towards along Benedict Way to discharge point 3 ("D3"). Activities in DA 3 include chemical storage tanks, cooling tower, shop area, testing and inspection. argon tank. DA 4 is to the east of DA 3 and storm water flows north and south to discharge point 4 ("D4"). It is unknown to LA Waterkeeper whether storm water sampled from DA 1, DA 2, DA 3, and DA 4 is representative of all industrial storm water discharged from the Facility as required by the Permit. Based upon publicly available materials industrial activities appear to occur throughout the Facility.

108.   The Facility SWPPP site map shows there are four sampling points, one in each of the four identified drainage areas, from where samples are collected. Upon information and belief, samples are taken from storm water sheet flow towards Bissel Place at SP1, SP2 adjacent to Benedict Way and at SP4 adjacent to Randolph Street, prior to discharge onto Bissel Place, Benedict Way, and Randolph Street where storm water enters side curb inlets to the Los Angeles County Municipal Separate Storm Sewer System ("MS4").

109.   The Los Angeles River Tributaries and Watershed and the Pacific Ocean are waters of the United States, and which, upon information and belief, receive stormwater discharges from the Facility.

**B. The Los Angeles River Tributaries and Watershed**

110.   LA Waterkeeper's members utilize the Receiving Waters for recreation, scientific study through pollution and habitat monitoring and restoration activities. LA Waterkeeper monitors the water quality, insect populations, and habitat at multiple locations in the Los Angeles River.

111.   The Los Angeles River and its estuary provide critical habitat for species, including some that are endangered, threatened, rare, and endemic to Southern California. The concrete-lined sections provide wading habitat for shorebirds that have

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

few other options, given that the majority of Los Angeles' wetlands have been destroyed. The Los Angeles River estuary provides a rich brackish habitat at the intersection of freshwater and saltwater environments. These river reaches support endangered species, including the Least bell's vireo, Western yellow-billed cuckoo, Willow flycatcher, and Tri-colored blackbird. They also support species of special concern, such as the Santa Ana sucker, arroyo chub, California brown pelican, yellow-breasted chat, long-billed curlew, bank swallow, and the California red-legged frog. These habitats remain vulnerable, however. Past habitat destruction and pollution have led to the extirpation of many species, including the western pond turtle and the steelhead trout, and many species listed here are likely to be extirpated in the near future.

112.   Queensway Bay is the outlet for the Los Angeles River and its estuary. San Pedro Bay includes the Los Angeles and Long Beach Harbors. The outer part of the harbors (the greater San Pedro Bay) is open to the Pacific Ocean. The northern portion of San Pedro Bay formerly consisted of marshes and mudflats with a large marshy area. The surrounding area was formerly wetlands but is now heavily developed and contains a marina, restaurants, beaches, and businesses. Ample recreational opportunities exist in and around the bays, including water contact sports such as kayaking, sailing, stand-up paddle boarding, rowing, and jet skiing, and other activities such as walking, bicycling, boating. The bays provide habitat for an abundant variety of aquatic and bird species and other wildlife.

**C. The Facility Storm Water Permit Coverage**

113.   SMARTS lists the current Facility WDID number for the Facility as 4 19I018443 and coverage under the Storm Water Permit as "Active."

114.   The NOI for the Facility lists the Receiving Water as "Los Angeles River".

115.   Via search of the SMARTS database, Plaintiff obtained the Facility SWPPP for the Facility, last revised in December 2022.

116.   Plaintiff is informed and believes, and thereon alleges, that Defendant has been operating with an inadequately developed or implemented SWPPP in violation of Storm Water Permit requirements since at least July 18, 2018. Defendant has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary, resulting in the Facility's unlawful effluent limitation violations.

117.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators failed to implement any additional BMPs as required by the Storm Water Permit. As such, the Owners and/or Operators are in daily violation of this requirement of the Storm Water Permit.

118.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owners/Operators have failed to implement BMPs that achieve compliance with Storm Water Permit or the CWA.

119.   Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility include, but are not limited to ammonia, O&G, TSS, N+N, aluminum, pH, zinc, copper, lead, cyanide, iron, and those mentioned in Sections 5 and 6 of the Facility SWPPP.

120.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to implement the minimum BMPs required by the Storm Water Permit, including good housekeeping requirements; preventive maintenance requirements; spill and leak prevention and response requirements; material handling and waste management requirements; erosion and sediment controls; employee training and quality assurance; and record keeping. (Storm Water Permit, Sections X(H)(1)(a)–(g).) The BMPs that are described in the Facility's SWPPP are insufficient to prevent the NAL and NEL exceedances for constituents listed above. As evidenced by the sample results, the current BMPs at the Facility are inefficient, and the Facility's Monitoring Implementation Plan needs improvement.

121.   Plaintiff is informed and believes, and thereon alleges, that Bodycote has further failed to implement advanced BMPs necessary to reduce or prevent discharges

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

of pollutants in its storm water sufficient to meet the BAT/BCT standards, including: exposure minimization BMPs; containment and discharge reduction BMPs; treatment control BMPs; or other advanced BMPs necessary to comply with the General Permit's effluent limitations. (Storm Water Permit X.H.2.) The most recent BMPs implemented are not sufficient because exceedances are still occurring. These BMPs are insufficient to achieve compliance with the General Permit.

122.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to collect sufficient storm water samples for analyses, in violation of the Storm Water Permit, since at least July 18, 2018.

123.   Plaintiff is informed and believes, and thereon alleges, that storm water discharges containing excess levels of aluminum, ammonia, iron, zinc, copper, cyanide, N+N, and TSS occur each time storm water discharges from the Facility in violation of the Storm Water Permit Sections III(C)–(D) and VI(A)–(B).

124.   Plaintiff is informed and believes, and thereon alleges, that the repeated and significant exceedances of NALs and Benchmark Levels demonstrate that the Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water and non-storm water from the Facility.

125.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to evaluate the effectiveness of its BMPs and adequately revise the Facility SWPPP, despite repeated and significant concentrations of pollutants in Facility's storm water discharges. Further, Defendant has failed to make changes to the Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

126.   Plaintiff is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Facility's operation areas.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

127.   Plaintiff is informed and believes, and thereon alleges, that the Owner's/Operator's failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with its industrial activities to precipitation, and that this results in discharges of polluted storm water from Facility and into local waterways in violation of the Storm Water Permit and/or the CWA.

128.   Plaintiff is informed and believes, and thereon alleges, that the Owner's/Operator's failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows from Facility into the Receiving Waters.

**D. Storm Water Discharges from the Facility**

129.   As discussed above and as detailed in the Facility SWPPP, there are four (4) discharge points at the Facility where storm water leaves the Facility and is discharged into the Los Angeles River and Pacific Ocean downstream.

130.   Plaintiff is informed and believes, and thereon alleges, that Bodycote has self-reported NAL and NEL exceedances from the Facility over the past five (5) reporting years, including without limitation for aluminum, ammonia, copper, cyanide, iron, lead, N+N, pH, TSS, and zinc.

**E. The Facility's Storm Water Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

131.   Plaintiff is informed and believes, and thereon alleges, that pollutants from the Facility discharge as surface drainage. It flows offsite and into the Los Angeles County MS4 system which flows into the Los Angeles River. There are no storm water treatment systems or storm water storage or containment areas onsite. It then flows downstream to the Los Angeles River Estuary, Queensway Bay, and San Pedro Bay.

132.   Plaintiff is informed and believes, and thereon alleges, that the Owner's/Operator's failure to properly address these pollutants and its sources results in the exposure of pollutants to precipitation, which carries these pollutants with storm water flows into the Los Angeles River, which then flows into the Los Angeles River

Estuary, Queensway Bay, San Pedro Bay, and the Pacific Ocean, all waters of the United States.

133.    Storm water discharges containing pollutants including, but not limited to, heavy metals such as zinc, lead, silver, magnesium, and copper, and iron adversely affect the aquatic environment.

134.    Samples of storm water discharges collected at the Facility contain pollutants including of iron, N+N, aluminum, cyanide, COD, ammonia, lead, cadmium, copper, pH, TSS, and zinc in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, Benchmarks, and/or the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

135.    Plaintiff is informed and believes, and thereon alleges, that during and/or after every significant rain event exceeding a continuing 0.1-inch per hour storm event, or any other storm water or non-storm water discharge that has occurred at the Facility since July 18, 2018, through the present, Defendant has discharged and continues to discharge storm water and non-storm water from the Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the technology-based Effluent Limitations, the Benchmarks, CTR, and/or the WQS.

**F.  Defendant's Violations of the Storm Water Permit's Sampling, Reporting, and Monitoring Implementation Plan Requirements**

136.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to develop an adequate Monitoring Implementation Plan ("MIP") for industrial operations at the Facility that complies with Section XI of the Storm Water Permit.

137.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Permit.

138.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to implement the MIP at the Facility, in violation of Section XI of the Storm Water Permit.

139.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to collect or analyze sufficient storm water samples at the Facility, in violation of Section XI of the Storm Water Permit.

140.    Plaintiff is informed and believes, and thereon alleges, that during the 2018-2019 reporting year, Defendant failed to collect or analyze any samples in the first half of the reporting year and only collected one (1) sample in the second half of the reporting year. However, Defendant failed to analyze that sample for pH and cadmium.

141.    Plaintiff is informed and believes, and thereon alleges, that during the 2019-2020 reporting year, Defendant collected two (2) samples in first half of reporting year, but again failed to analyze the samples for pH and cadmium. Defendant failed to collect or analyze any samples in the second half of the 2019-2020 reporting year.

142.    Plaintiff is informed and believes, and thereon alleges, that during 2020-2021 reporting year, Defendant failed to collect or analyze any samples in first half of reporting year. Defendant collected two (2) samples in the second half of the reporting year; however, one (1) of those samples was collected from SP4 and the other one (1) from each of SP1, SP2, and SP3. The parameters analyzed were again insufficient, as the sample collected at SP4 was not analyzed for pH. Further, none of the samples collected during the 2020-2021 reporting year were analyzed for cadmium.

143.    Plaintiff is informed and believes, and thereon alleges, that during the 2021-2022 reporting year, Defendant collected two (2) samples in first half of reporting year; however, Defendant only collected one (1) in second half of the reporting year. None of these samples were analyzed for pH or cadmium.

144.    Plaintiff is informed and believes, and thereon alleges, that during the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

2022-2023 reporting year, Defendant collected four (4) QSE samples, but all were collected in the second half of the reporting year—no samples were collected in the first half of the reporting year. Of the four (4) samples collected, Defendant only analyzed one (1) QSE sample for pH and cadmium.

145. Plaintiff is informed and believes, and thereon alleges, that since Defendant has failed and continues to fail to collect sufficient and consistent storm water samples, such as the instances described in the paragraphs above, the documented exceedances are not a true representation of the exceedances discharged by the Facility. If Defendant were collecting and analyzing sufficient stormwater samples, there would be a greater number of documented exceedances.

146. Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to adequately revise the MIP for the Facility as necessary to ensure compliance with the Storm Water Permit in violation of Section XI of the Storm Water Permit.

147. Plaintiff is informed and believes, and thereon alleges, that the Defendant failed and continues to fail to analyze samples for pollutants likely present in the Facility's stormwater discharges as required by the Storm Water Permit.

148. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility consistently fail to prepare, implement, and report on its Water Quality Based Corrective Actions as required by the Storm Water Permit.

149. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators of the Facility have consistently failed and continue to fail to report any non-compliance with the Storm Water Permit at the time that the Annual Report is submitted.

150. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance as required by the Storm Water Permit.

151. Plaintiff is informed and believes, and thereon alleges, that the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

1  Owners/Operators of the Facility fail to collect sufficient storm water samples during
2  QSEs.

3      152.   Based on information available to Plaintiff, it is informed and believes,
4  and thereon alleges, that the BMPs proffered as implemented in the Facility SWPPP
5  are insufficient and ineffective in reducing pollutants to levels compliant with the
6  Storm Water Permit and/or the CWA.

7      153.   Plaintiff is informed and believes, and thereon alleges, that Defendant has
8  failed to submit accurate Annual Reports to the Regional Board for the past five (5)
9  reporting years in violation of Section XVI of the Storm Water Permit.

10     154.   For example, Plaintiff is informed and believes, and thereon alleges, that
11  Defendant failed to submit an accurate Annual Report for the 2022-2023 reporting
12  year. The Annual Report indicated that all required QSEs were sampled during the
13  2022-2023 reporting year; however, no QSEs were sampled in the first half of the year.
14  All four (4) QSEs were sampled in the second half of the reporting year, and only one
15  (1) of the four (4) QSEs was analyzed for pH and cadmium.

16     155.   Plaintiff is informed and believes, and thereon alleges, that during the
17  2017-2018 reporting year, the Facility submitted a Level 2 ERA Action Plan in lieu of
18  Level 1 ERA technical report for NAL exceedances for zinc, copper, cyanide, N+N,
19  ammonia and total suspended solids. Zinc and copper entered Level 2 status, while
20  aluminum, iron, magnesium, cadmium, and silver remained in Level 1. Further, new
21  parameters entered Level 1, which included cyanide, N+N, ammonia and total
22  suspended solids.

23     156.   Plaintiff is informed and believes, and thereon alleges, that during the
24  2018-2019 reporting year, the Facility continued to have exceedances for aluminum,
25  copper, iron, and zinc, while only collecting samples from one (1) QSE. Both copper
26  and zinc remained at Level 2.

27     157.   Plaintiff is informed and believes, and thereon alleges, that during the
28  2019-2020 reporting year Bodycote remained in ERA Level 2 for copper, iron and zinc.

158.   Plaintiff is informed and believes, and thereon alleges, that during the 2020-2021 reporting year, the Facility reported Level 2 status recording NAL exceedances for aluminum, cyanide, copper, iron, zinc, nitrogen, and total suspended solids.

159.   Plaintiff is informed and believes, and thereon alleges, that during the 2021-2022 reporting year, the Facility collected stormwater samples during three QSEs and had exceedances for Level 2 status for aluminum, iron, zinc, copper, cyanide, N+N, and TSS.

160.   Plaintiff is informed and believes, and thereon alleges, that results of samples collected for the 2022-2023 reporting year show continued NAL exceedances for aluminum, ammonia, copper, iron, TSS, and zinc.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

161.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

162.   Plaintiff is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

163.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water discharges from the Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the CWA. (*See* Storm Water Permit, Sections I(D) (Finding 32)V(A); 33 U.S.C. § 1311(b).)

164. The Owners/Operators violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

165. Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Effluent Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

166. Each day, since at least July 18, 2018, that the Owners/Operators discharge storm water containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

167. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 18, 2018 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

168. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

169. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

170. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**SECOND CAUSE OF ACTION**
**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Numeric Effluent Limitations.**
**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

171. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

172.   Plaintiff is informed and believes, and thereon alleges, that Defendant failed and continues to fail to comply with the Storm Water Permit's Numeric Effluent Limitations.

173.   Plaintiff is informed and believes, and thereon alleges, that Defendant violates, and will continue to violate the Storm Water Permit's Numeric Effluent Limitations each day that storm water discharges from the Facility. (Storm Water Permit, Section V(C).)

174.   Plaintiff is informed and believes, and thereon alleges, that Defendant violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

175.   Plaintiff is informed and believes, and thereon alleges, that Defendant's acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

176.   Plaintiff alleges that its members have been harmed by Defendant's acts and omissions described herein and have standing to bring this suit.

177.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). 151. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 18, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

178.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

179.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

180.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water
in Violation of the Storm Water Permit's
Receiving Water Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

181.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

182.   Plaintiff is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

183.   Plaintiff is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, including but not limited to standards set forth in the applicable Basin Plan, has discharged and continues to discharge from the Facility each time storm water discharges from the Facility.

184.   The Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS discharges from the Facility.

185.   Plaintiff is informed and believes, and thereon alleges, that the Owners'/Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

186.   Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

187.   By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 18, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

188.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

189.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

190.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollutant Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

191.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

192.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

193.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement a SWPPP

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

for the Facility, in violation of the Storm Water Permit.

194. Plaintiff is informed and believes, and thereon alleges, that Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

195. The Owners/Operators have been in violation of the Storm Water Permit at the Facility every day from July 18, 2018, to the present.

196. The Owners'/Operators' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

197. The Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

198. Each and every violation of the Storm Water Permit's SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

199. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 18, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

200. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

201. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

202. WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

## FIFTH CAUSE OF ACTION
### Defendant's Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Plan in Violation of the Storm Water Permit and the Clean Water Act.
### U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

203. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

204. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

205. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately implement an MIP for the Facility, in violation of the Storm Water Permit.

206. Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed and continue to fail to adequately revise an MIP for the Facility, in violation of the Storm Water Permit.

207. The Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Facility every day from July 18, 2018, to the present.

208. The Owners'/Operators' violations of its Storm Water Permit's monitoring requirements and the CWA at the Facility are ongoing and continuous.

209. The Owners/Operators will continue to be in violation of Section XI of the Storm Water Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an MIP for the Facility.

210. Each and every violation of the Storm Water Permit's MIP requirements at the Facility is a separate and distinct violation of the CWA.

211. By committing the acts and omissions alleged above, the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 18, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

212.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

213.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

214.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**<u>SIXTH CAUSE OF ACTION</u>**
**Defendant's Failure to Report as Required by the Storm Water**
**Permit in Violation of the Storm Water Permit and the**
**Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

215.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

216.   Section XVI of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. Storm Water Permit, Section XVI. Laboratory reports of sample analysis, the annual comprehensive site compliance evaluation report, an explanation of why a permittee did not implement any activities required are also reporting requirements throughout the reporting year and are typically uploaded into the SMARTS portal.

217.   The Permit also requires a permittee whose discharges violate the Storm Water Permit's Receiving Water Limitations or water quality standards, such as, NALs, TMDLs, TMDL-Specific Numeric Action Levels and NELs to implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX(B) of the Permit and report to the Regional Board regarding same. (*See* Storm Water Permit, Section XX(B).)

218.   Plaintiff is informed and believes, and thereon alleges, that the Owners/Operators have failed to accurately report their non-compliance with the Storm Water Permit and correctly report storm water sampling analysis compliance in the Facility's Annual Reports. As such, Defendant is in daily violation of the Storm Water Permit.

219.   Further, Defendant has repeatedly failed to submit required ERA Level 1 and/or Level 2 Reports, despite entering into those levels for various constituents. As such, Defendant is in daily violation of the Storm Water Permit Section XII.

220.   The Facility Owners/Operators have been in violation of Sections XII, XVI and XX of the Storm Water Permit since at least July 18, 2018.

221.   The Owners'/Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

222.   By committing the acts and omissions alleged above, the Owners/Operators of the Facility are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 18, 2018, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

223.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

omissions alleged above would irreparably harm Plaintiff, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

224.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

225.   WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.   <u>RELIEF REQUESTED</u>

226.   Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

**a.**   A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342, for its unlawful discharges of pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent standards limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA;

**b.**   A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

**c.**   A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015, where penalties are assessed on or after January 6, 2023, of $64,618 per day, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

**d.**   A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section

1    505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

2              **e.**      Any other relief as this Court may deem appropriate.

3

4    Dated: September 20, 2023                    Respectfully submitted,

5

6                                          */s/* Jason R. Flanders

7                                          Jason R. Flanders
                                           Theresa M. Trillo
8                                          AQUA TERRA AERIS LAW GROUP
                                           Attorneys for Plaintiff
9                                          LOS ANGELES WATERKEEPER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES